Daniel LATHAM *v.* ARKANSAS DEPARTMENT of
HEALTH and HUMAN SERVICES

CA 06-969                                                    256 S.W.3d 543

Court of Appeals of Arkansas
Opinion delivered May 9, 2007

*Dale Casto*, for appellant.

*Gray Allen Turner*, Office of Chief Counsel, for appellee.

*Teresa McLemore*, attorney ad litem.

WENDELL L. GRIFFEN, Judge. Daniel Latham appeals from an order terminating his parental rights with regard to his son, B.L., d.o.b., 06/01/95. Latham's three children were removed from his custody after he became intoxicated and struck his pregnant, teenaged daughter (B.L.'s sister).[1] Latham, who was on parole, was returned to jail due to that incident. Latham was released from jail prior to the termination hearing; however, the trial court terminated his parental rights, finding that he had not remedied the conditions that necessitated removal, that he had subjected B.L. to aggravated circumstances in that there was little likelihood of successful reunification, and that termination was in B.L.'s best interests. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) (Supp. 2005); § 9-27-341(b)(3)(B)(ix)(3)(B)(i); § 9-27-341(b)(3)(A). We affirm the termination order.

Latham has admittedly been in and out of prison "a bunch" of times and has admittedly used drugs, as has his wife, Christine Latham (B.L.'s mother). The record reflects that Latham and

---

[1] Latham's parental rights to B.L.'s older siblings, D.L. and O.L., were not terminated. Each remained in state custody with the ultimate goal of independence. The mother's rights to each child were also terminated; her rights are not the subject of this appeal.

Christine had a volatile, twenty-year relationship and that whenever Latham returned to prison the children were prone to truancy and other delinquent behavior. The record also reflects that when Latham was not in prison, the children fared better, at least with regard to school attendance — they did not miss school as often when Latham was at home. However, due to the parents' volatile relationship, their drug usage, and Latham's repeated prison stays, the children have experienced considerable instability.

Appellee Arkansas Department of Health and Human Services (ADHHS) first became involved with the Lathams in 2000, due to Christine's drug usage, and later became involved due to medical neglect. On June 1, 2005, B.L.'s tenth birthday, the children were removed from Christine's custody, due to substance abuse, and were placed with Latham. On June 7, 2005, six days later, appellee learned that the children were staying with Glenneva Hunt, a cousin. The investigation revealed that on June 6, 2005, Latham apparently got into an argument with D.L., who was nearly sixteen, and pregnant. D.L. told the investigator that Latham was drunk, that he hit her and pushed her against the wall, and that the altercation caused her nose to bleed. Latham, who was out of prison on parole, was returned to prison due to the incident.

Appellee placed an emergency hold on all three children to remove them from immediate danger of severe maltreatment. The trial court subsequently found probable cause to continue the children in foster care; the children remained with Hunt. Latham was not awarded visitation. He was ordered to maintain stable housing and employment; to remain drug-free; to pay child support of $30 per week; to cooperate with appellee; and to follow the case plan and court orders.

After the August 3, 2005 adjudication hearing, the trial court determined that the children were dependent-neglected due to Latham's incarceration and Christine's use of illegal drugs and failure to properly supervise the children. In addition to prior orders, Latham was ordered to submit to and pass random drug screens. On August 24, 2005, appellee resumed physical custody of the children because Hunt left them with appellee. B.L. was placed in another foster-care home.

A review hearing was held on November 16, 2005. This order did not impose any additional conditions on Latham. The case goal continued to be reunification, but the court scheduled the no-reunification permanency-planning hearing for January 19,

2006. After being notified of the date of the January 19 hearing, Latham sent a letter to the trial court requesting a continuance. He explained that he had been granted parole but wanted to remain in prison until he completed the anger-management and substance-abuse courses in which he had enrolled. The hearing was held as scheduled and Latham attended by telephone.

The testimony regarding B.L. generally established that he was improving in foster care and that Latham regularly wrote letters to B.L. to which B.L. did not respond. After the permanency-planning hearing, the case goal was changed to termination. In the no-reunification order, the trial court found that both parents had subjected the children to aggravated circumstances in that there was little likelihood that services to the family would result in successful reunification. With regard to Latham, the court noted that over the last six years appellee had been involved with the family, the children "do okay" when Latham is "out of prison and sets the rules" but that the children suffer and do not have their needs met due to the "chaotic and volatile" relationship between Latham and Christine. In the permanency planning order, the trial court noted that Latham was incarcerated and had made only minimal progress toward complying with the court orders and case plan.

Appellee subsequently filed a petition to terminate Latham's parental rights. The termination hearing was held on April 20, 2006. At that point, Latham had been released from prison for two months. Although he had worked steadily since his release, he did not have an appropriate home because he lived with friends.

B.L. was nearly eleven years old at the time of the termination hearing. The testimony established that B.L. was improving in foster care and had not expressed a desire to live with Latham. The court was "amazed" at the progress that B.L. had made. It noted that for the first time in B.L.'s life, he had a "stable place where people aren't fighting, and daddies aren't going to prison and mommies aren't doing meth." The court acknowledged that Latham was employed, had filed for divorce from Christine, and had completed anger-management and substance-abuse courses while in prison.

Nonetheless, the trial court believed that returning B.L. to Latham's care would not be in B.L.'s best interest because it would be

> ripping [B.L.] out and putting him basically back in a situation that has always been volatile with the hopes that Mr. and Ms. Latham

will stay apart, with the hopes that dad will maintain his sobriety when he's only been out of prison for a month, I don't think that's in [B.L.'s] best interest and I believe that would be harmful. I also find with respect to [B.L.] that he's very adoptable . . . [and that] both parents subjected him to aggravated circumstances . . . And I find that both parents have not remedied the conditions that caused B.L.'s removal, that the testimony is that even though dad filed for divorce that he and Ms. Latham are still married. . . . So it's not just a problem between mom and dad that caused these children to come into [foster] care. It's anger issues. It's abuse of illegal drugs. It's just not even meeting their basic needs of getting the kids to school. So I find that with respect to [B.L.] it's in his best interest that both mother's and father's rights be terminated.

The trial court orally noted its previous finding that both parents had subjected the children to aggravated circumstances and determined that Latham failed to correct the conditions that caused B.L.'s removal from Latham's custody. It terminated Latham's parental interests with regard to B.L. only, continuing the case goal of independence for B.L.'s older siblings. It found that termination was in the best interest of B.L., considering the likelihood that he would be adopted if the termination petition was granted and the potential harm, including the effect on the health and safety of the child, caused by returning him to the custody of his parents. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). Additionally, the trial court found that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of B.L. to Latham's custody is contrary to B.L.'s health, safety, or welfare and that, despite the offer of appropriate family services, Latham manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate his circumstances that prevent return of the B.L. to his custody. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a). Finally, the court found that termination was proper because Latham had subjected B.L. to aggravated circumstances in that there was little likelihood that services to the family will result in successful reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(3)(B)(i).[2] In so doing, the court specifically incorporated its previous findings regarding aggravated cir-

---

[2] The court also cited to portions of the termination statute that are applicable only where a child has been out of the home for more than twelve months. Clearly, B.L. had not been out of Latham's custody for more than twelve months, because he was removed from

cumstances. It also incorporated all of the pleadings and testimony in the case in its subsequent written order.

A circuit court may terminate parental rights if the court finds that there is an appropriate permanency-placement plan for the juvenile; finds by clear and convincing evidence that termination is in the best interest of the children considering the likelihood that the child will be adopted and the potential harm the child would suffer if returned to the parent's custody; and finds that at least one statutory ground for termination exists. *See* Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *See Camarillo-Cox v. Arkansas Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005).

When the burden of proving a disputed fact is by clear and convincing evidence, the inquiry on appeal is whether the trial court's finding is clearly erroneous. *See Linker-Flores v. Arkansas Dep't of Human Servs.*, 359 Ark. 131, 194 S.W.3d 739 (2004) (*Linker-Flores I*). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *See Camarillo-Cox, supra.* In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. *See Camarillo-Cox, supra.* We review such cases de novo on appeal. *See Camarillo-Cox, supra.*

Latham argues that the trial court erred in terminating his parental rights because there was no evidence that he was an unfit parent or that termination would be in B.L.'s best interests. He also argues that the trial court ignored his efforts to comply with the court's orders.[3] We disagree.

---

Latham's custody in June 2005 and the termination order was entered in May 2006. Nonetheless, the evidence supports that termination was proper due to Latham's exposure of his children to aggravated circumstances and due to his failure to remedy the subsequent conditions that arose after removal — grounds that do *not* require a child to have been out of the home for more than twelve months. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(3)(B)(i) and (b)(3)(B)(vii)(a).

[3] Latham cites to two cases in which the termination of parental rights have been reversed based on the insufficiency of the evidence: *Long v. Ark. Dep't of Human Servs.*, 96 Ark. App. 1, 237 S.W.3d 529 (2006); *Conn v. Ark. Dep't of Human Servs.*, 79 Ark. App. 195, 85

It is undisputed that Latham made some progress in this case and has shown an interest in regaining custody of B.L. by writing letters to his son while incarcerated. Nonetheless, the trial court did not err in terminating Latham's parental rights to B.L. where Latham failed to prove that he could provide for one of B.L.'s most basic needs — a stable home. *See Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Latham testified at the permanency planning hearing in January 2006 that he had enough money "waiting" for him when he was released from prison to rent a suitable home for his children and said that "all I've got to do is find a place that is suitable for them." Upon his release from prison, Latham resumed work in his long-time vocation of building houses; he testified that he earned approximately $2,000-$2,500 per month and paid rent of $120 per week ($480 per month).

Yet, at the time of the termination hearing, three months after declaring his desire and ability to secure proper housing for his children, and two months after his release from prison, Latham had not obtained suitable housing. He was living with friends and had not obtained a home suitable for even one child because, in his words, it would be "pretty expensive." He admitted that the home

---

S.W.3d 558 (2002). However, neither case compels reversal here. The *Long* case was, in fact, reversed by the Arkansas Supreme Court. *See Long v. Ark. Dep't of Health and Human Servs.*, 369 Ark. 74, 250 S.W.3d 560 (2007). The termination order in the *Conn* case was reversed on inapposite facts because the trial court there terminated the parent's rights with regard to one child where no evidence was submitted regarding the parent's conduct toward that child, but termination was based solely on a stipulation concerning the earlier termination of the parent's rights to *another* child. There is no lack of evidence regarding Latham's conduct toward B.L. in the instant case.

Latham also purports to challenge the separate findings that the children were subjected to aggravated circumstances and that appellee failed to provide reasonable efforts to effect reunification. We do not address these issues on the merits because they were not raised below. With regard to aggravated circumstances, we note that the trial court orally found that both parents subjected B.L. to aggravated circumstances. The termination statute does not require a specific finding of aggravated circumstances as to *each* child; section 9-27-341(b)(3)(B)(ix)(3)(B)(i) clearly authorizes termination based on a finding that the parent has subjected "any juvenile" to aggravated circumstances. Moreover, given that the trial court orally found that Latham had exposed B.L. to aggravated circumstances and in its orders consistently refers to all three children in the aggregate, as "the children," there is nothing in the trial court's orders to suggest that it excluded B.L. from this finding.

in which he stayed was not suitable for his children because it did not contain enough bedrooms.

Second, Latham remained married to Christine at the time of the termination hearing. Even though Latham and Christine testified that the divorce papers had been signed and they had no plans to reunite, the trial court was not required to ignore the fact that Latham and Christine had a long history of a volatile relationship, that B.L. had suffered as a result of that volatile relationship, and that Latham remained married to Christine. Put differently, the trial court was entitled to assess Latham's credibility regarding his avowed plan to sever his ties to Christine.

Third, while Latham insists that the biggest problem for the children was his chaotic relationship with Christine and insists that "obstacle" has been removed because he no longer lives with her and they are awaiting a divorce, there are other obstacles preventing Latham from providing a stable environment for B.L. within a reasonable time period, from B.L.'s perspective. Latham's failure to recognize and address these additional obstacles is further proof that he is not in tune with B.L.'s needs or with his own deficiencies as a parent. For example, Latham admitted that his children need an environment that does not "fall apart" whenever he is not around. However, he admittedly has been incarcerated "a bunch of times" and will be on parole until 2012. Also, there is no evidence that he sought visitation with B.L. when he was released from prison the last time.

In addition, although Latham admittedly had drug problems and was returned to jail in June 2005 for being drunk and hitting his daughter, he did not begin drug treatment until October 2005, and he offered no explanation for why he delayed in seeking treatment. Similarly, without explanation, he delayed taking the anger-management course. Latham completed the substance-abuse program only three months before the termination hearing and had been out of jail only two months at the time of the termination hearing. He did not finish his anger-management course until after the permanency-planning hearing, and only two months prior to the termination hearing. Given Latham's prior history and the fact that the children were removed from his custody because he was drunk and assaulted his pregnant daughter, the trial court was appropriately concerned about whether Latham would remain sober, control his anger, and stay out of prison.

██ Contrary to Latham's argument, the trial court did not ignore the progress he made in this case; rather, it simply found that Latham's efforts were not sufficient to prevent termination. The trial judge was in the best position to assess Latham's credibility with regard to his willingness or desire to properly care for B.L. The progress that Latham made in this case was too little and occurred too late to achieve reunification within a reasonable time, from B.L.'s perspective. *See Malone v. Ark. Dep't of Human Servs.*, 71 Ark. App. 441, 30 S.W.3d 758 (2000); Ark. Code Ann. § 9-27-341(a)(4)(A).

Finally, the trial court properly determined that termination is in B.L.'s best interest. Teresa Jones, the caseworker, testified that termination was in B.L.'s best interest, primarily due to the stability of his foster home and the improvements he had made while *not* in Latham's care. B.L.'s foster mother testified that B.L. rarely mentions Latham and that he has never responded to any of Latham's letters. Jones also testified that B.L. had bonded with his foster family, was doing "really well," is happy with his living arrangements, and is adoptable. She said that B.L. is in a stable home and that it is in his best interest to stay there. The CASA volunteer also recommended that B.L. remain with his foster family, and B.L.'s ad litem specifically recommended termination.

Since being removed from Latham's custody, B.L. is more confident, less aggressive toward others, and his attitude toward school has improved. Notably, B.L.'s school counselor stated in a letter dated the day prior to the termination hearing that "B.L. is now interacting with other kids, forming relationships, and taking more of an active role in his education. . . . He seems to be settling into a routine." It is a routine the trial court justifiably determined should not be disturbed.

Affirmed.

PITTMAN, C.J., BIRD, MILLER, and HEFFLEY, JJ., agree.

HART, GLADWIN, ROBBINS, and VAUGHT, JJ., dissent.

JOHN B. ROBBINS, Judge, dissenting. I agree with the majority's conclusion that the trial court did not clearly err in finding that termination of appellant's rights was in B.L.'s best interest. However, I would hold that the trial court clearly erred in finding clear and convincing evidence of one of the additional statutory grounds necessary to support a termination order. Therefore, I re-

spectfully dissent from the majority opinion that affirms the termination of Mr. Latham's parental rights.

The trial court terminated appellant's parental rights on the following three grounds[1] set out in Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2005):

(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)(*a*) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

. . . .

(ix)(*a*) The parent is found by a court of competent jurisdiction . . . to:

(*3*)(A) Have subjected any juvenile to aggravated circumstances.

(B) "Aggravated circumstances" means:

(i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification[.]

---

[1] A fourth ground was discussed in the trial court's order of termination, i.e., § 9-27-341(b)(3)(B)(ii)(a); however, the court's findings on this ground specifically pertained only to B.L.'s mother.

The majority appears to acknowledge that the trial court erred to the extent that it terminated Mr. Latham's parental rights on the ground set forth in subsection (i) inasmuch as B.L. had only been out of Mr. Latham's custody for just over ten months rather than twelve months as required under this subsection. The trial court's finding that B.L. had "continued out of the custody of father for twelve (12) months" is clearly erroneous. The majority relies on the two remaining subsections to affirm, which in my view are inapplicable to the circumstances of this case.

> *(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.*

As to the trial court's reliance on (vii)(a), the only finding of fact made by the court as pertains to Mr. Latham is "Father went to prison." Actually, Mr. Latham had already been taken into custody when the original petition for dependency-neglect was filed on June 13, 2006. Consequently, Mr. Latham's incarceration was not a factor that *arose subsequent to the filing of the original petition.* Furthermore, even if his incarceration had occurred subsequent to the date of the petition, the requisite additional finding under this ground that "the parent has manifested the incapacity or indifference to remedy the subsequent" factor is clearly erroneous because Mr. Latham had indeed been released from prison prior to the termination hearing. For these reasons subsection (vii)(a) could not support a termination of Mr. Latham's parental rights.

> *(ix)(a) The parent is found by a court of competent jurisdiction . . . to:*
>
> *(3)(A) Have subjected any juvenile to aggravated circumstances.*
>
> *(B) "Aggravated circumstances" means:*
>
> > *(i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification[.]*

The trial court's order did not specify the aggravated circumstances to which Mr. Latham had subjected B.L.; however, it incorporated by reference the aggravated circumstances that it had

set forth in its earlier Order For No Reunification Services dated January 19, 2006. That order made numerous findings regarding Mrs. Latham, but only found the following regarding Mr. Latham:

> As to Father, the Court has had several cases on the family over past six years. Father is currently incarcerated by ADOC. When father is out of prison and sets the rules, children do okay, but it is the relationship between Mother and Father gets chaotic & volatile (as it always does) the children suffer — they don't get proper supervision & needs met (D.L. pregnant at age 15, O.L. committing crimes and going to DYS, B.L. not going to school, etc.) When Father hopefully gets out of prison end of Jan. 2006, and will be on parole until 2008. Father will either be successful upon release from prison or not.

These observations fall far short of finding that B.L. had been "abandoned, chronically abused, subjected to extreme or repeated cruelty, [or] sexually abused" by Mr. Latham. Neither does it support a conclusion that "there is little likelihood that services to the family will result in successful reunification."

Mr. Latham did not demonstrate indifference to remedying the problems that resulted in the removal of his children from the home. To the contrary, he wrote frequent letters to all three children during his incarceration in prison, and also completed courses in anger management and substance abuse treatment. Upon his release from prison, Mr. Latham secured gainful employment earning $9.95 per hour working sixty to eighty hours per week. While Mr. Latham was living at a friend's house at the time of the termination hearing, he had only been out of prison for three months and explained that he had the means to rent a larger home appropriate for his children, but had yet to do so due to the uncertainty of this case. Mr. Latham had filed for divorce and had no plans to reunite with the children's mother, who had clearly been a negative factor in the children's lives. Mr. Latham stated, "I've been taking care of them all their lives," and wanted to continue to be a parent to his children.

Nor was there any proof that Mr. Latham was incapable of being a fit parent to any of his children, including B.L. The trial court chose not to terminate Mr. Latham's parental rights to his two older children, and DHHS worker Teresa Jones testified that Mr. Latham's older son O.L. expressed a strong desire to live with him. Ms. Jones stated that Mr. Latham is not an unfit parent, and

she recommended that O.L. be returned to Mr. Latham "if Daniel is able to stay clean and gets a place to live." Ms. Jones testified that Mr. Latham cooperated with her in every way, indicating that Mr. Latham was motivated to pursue reunification with all of his children.

While there are legitimate concerns about Mr. Latham's prior criminal history, it is evident that since his children were removed from his custody he has made legitimate progress toward reunification. Mr. Latham has done nothing since that time to demonstrate that the return of B.L. to his custody would put B.L. at risk. And under the circumstances of this case, I believe that continued services would have resulted in a legitimate likelihood of reunification. For these reasons, I would reverse the order terminating Mr. Latham's parental rights.

HART, GLADWIN, and VAUGHT, JJ., join in this dissent.